Good morning, everyone. We have six cases on today's argument calendar. We're going to proceed in a slightly different order from that published on the court schedule. We'll begin with case number two and then revert back to case number one. So we'll start with the appeal in 24-17-19, Anthony Sullers v. International Union Elevator Constructors. We have, yes, is it Ms. Bichner? Ms. Bichner, thank you, Your Honor. Bichner, you're welcome. Good morning to you. Can you hear me okay from the courtroom? I can, thank you, Your Honor. Okay, and are the screens visible to you? Yes, Your Honor. Okay, go ahead and proceed. May it please the court, Your Honor, my name is Darren Van Pembroke and I'm here on behalf of the plaintiff appellant, Anthony Suller, who is present with me in court today. I'd reserve any time that remains after my opening remarks if necessary. Mr. Sullers is and continues to be a member of Defendant Union IUEC Local No. 2 and was an employee of ThyssenKrump, a German elevator company with operations in Chicago, who filed a complaint against his union alleging that they breached their duty of fair representation by acting arbitrarily, discriminatorily, and in bad faith. The district court erred in our view, with all due respect, in granting summary judgment to the defendants by ignoring what we believe are genuine issues of material fact, both with regard to arbitrary conduct by the union and discriminatory conduct by the union. Among the genuine issues of material fact have to do with the union's acknowledgment and receipt of information that Mr. Sullers was in fact subject to racial discrimination by TKE and the actions of the union in determining that there was absolutely no evidence of that discrimination and then admitting that they had done no investigation whatsoever. So the issue is not that the union has an obligation to investigate racial discrimination. The issue is when they take in information, and I'll get to this in a minute, and address to the employee that they will pursue it and do nothing and then have no basis whatsoever to make a declaration that the charges against the company are not valid. And it sounds mixed up and strange, I admit it, because that is the arbitrary nature of the conduct of the union as it relates to Mr. Sullers in this case. Counsel, you're focusing on the arbitrary and discriminatory parts of that test. Am I reading your argument correctly? Yes. Because the brief was not that specific in terms of which prong you were arguing under. So, from what I understand, the written grievance did not mention race, but orally Mr. Sullers discussed race discrimination. Is it your position that if the union has some knowledge, despite what might be written in the grievance, the union has a duty to investigate? I think there's first a factual issue that needs to be addressed, and that is that Mr. Sullers, the evidence shows, did not draft the grievance, did not see the grievance. The grievance was drafted by the union. In fact, there's record citation to the fact that Mr. Sullers had little knowledge about the grievance process. And in fact, I'll reference this because I think it's very important. So who drafted the grievance? The union. The union. And there's evidence in the record? Yes. Okay. See, this is the problem, is that there has to be things brought together. You can't leave it to us to connect the dots. And I apologize, that was not our intent. But one thing I want to bring to the court's attention is there is this notion that Mr. Sullers never asked the union to investigate the discrimination he was subject to. And there's been case law cited by the defendant that says even if the union knows about discriminatory conduct, it has no affirmative obligation. And there's a citation to a record by the defendants that I think is incomplete. And if you'll indulge me, I just want to read a couple of lines and I think it'll bring to light what we're referring to, if that's permitted, your honors. All right. Question is asked of Mr. Sullers. Anything else? Can you just be clear, what are you reading from? I'm reading from docket 68, page 74, line 6 through 18. Okay. And what is it? It is the testimony of Mr. Sullers in this case, the plaintiff in this case. Deposition testimony?  Okay. Okay. Anything else the union did to stonewall you? Well, not taking my discrimination seriously or even fighting for the discrimination I was subject to by Tiss and Crub. And what did you want the union to do to fight for you? Well, at least perhaps make a grievance regarding the discrimination. Did you ask them to do that? No, I didn't, just as well as I didn't ask them to draw up the grievance. They brought it to my attention. And what the defendants did is cite only that first line that said no. And what Mr. Sullers testified to is he relied on his union and his union brought to him that they could file a grievance based on the discrimination he was subject to. But the reality is, despite telling him that, the union never filed a grievance on Mr. Sullers' behalf based on discrimination. There was a grievance that had been filed with regard to a layoff. And that brings me to another genuine issue of material fact. There is a factual dispute between the parties about whether the employer, Tiss and Crub, is the one that said we're not going to resolve your grievance about your layoff unless you drop your Illinois Department of Human Rights investigation. And the union's position is we were just carrying that message. But the reality is that the record that has been provided here shows that it was the union telling Mr. Sullers, in addition to TKE, you're never going to work at that company again, you're never going to work in this industry again, unless you drop your Illinois Department of Human Rights investigation. Where are the record citations for that proposition? Hang on just a sec. Okay, docket 73, page 65, paragraph 2. And what is that? That is Mr. Sullers' affidavit. It says, John Valone stated that Mr. Sullers must drop his claims of racial discrimination to TKE or by TKE, or he would not be allowed to return to work or collect the back pay he was owed. There's a further reference in that same docket, number 73, at page 65, paragraph 6. John Valone's screaming rant at the plaintiff stating that nothing would be done for the plaintiff unless he agreed to drop his IHRA discrimination charges against TKE. There's another union official, his name is Eddie Christian, and that same document recites Eddie Christian's repeat of the same position by the union, that they're not going to do anything for Mr. Sullers unless he drops his claim. And Mr. VanPepper, can you step back a little bit, because I've got to tell you, I came into this very much of a mind, along some of the lines of the questions that Judge Maldonado is asking you, that I just, I did not see anything suggesting that Mr. Sullers, in writing or orally, asked a union representative, Mr. Valone or anyone else, to pursue a claim of race-based discrimination. I very much understood that he was upset about the other mechanic being hired during the stay at home or layoff period, or whatever the best way to characterize that is. I was also aware, or I gleaned as best I could from this, that he informed Mr. Sullers that he himself may go to the Illinois Department of Human Rights with a race allegation. But isn't there some obligation on his part to bring this to the attention of the union in terms of what he wants to grieve? Because how is the union otherwise going to know? So there is, I'll reference Docket 71-1 at paragraph 9, where Mr. Sullers indicated, I repeatedly explained the many ways in which TKE had acted out of racial discrimination, including by laying off myself and Kenny Smith in April of 2018. And what do you, can you just tell us what the documents are? The numbers don't mean as much to me as they do to you. It's Mr. Sullers' affidavit. Okay, submitted when? At summary judgment? Yes. Okay. And I'll go back to, I won't read again what I read earlier. He had a discussion with the union and they said to him, we will bring to your attention what we can do for you. The confusing part is the union takes charge of filing grievances. The facts are given to the union from the employee and the union drafts the grievance and then pursues it on their behalf. Mr. Sullers says, no, I didn't specifically say, will you file a grievance on my behalf? They told me they could do it. So there's a discussion. And that's what we believe this testimony at docket 68, page 17, or page 17, 16 through 18, his deposition transcript is fairly read as. And we think in the context of a motion for summary judgment, any ambiguity has got to be construed reasonably in his favor. He did not say, no, I never said don't pursue a grievance. And he said his, and really what he said is our course of dealings is when I have an issue that I think it needs to be pursued by the union or is a violation of the collective bargaining agreement, I go to my union representative, explain what happens, what's happened, and they tell me what to do. And what that testimony says is Mr. Gonzales told me we can file a grievance based on discrimination, but they never did it. And then they declared there was no discrimination without doing any investigation. That is arbitrary. That is a breach of the duty of fair representation. I want to talk just a little bit about the court's credibility determinations. I think it's, there's no dispute that at a summary judgment level, a court should not engage in credibility determinations. And here, it's very clear that the district court unfortunately did just that. For example, we just talked a little bit about the grievance. The court tried to resolve Mr. Gonzales' contradictory testimony of saying we didn't do any investigation, but there was no discrimination by saying, well, the grievance form is something that didn't include that information. The court didn't have any basis to know who actually filled the grievance form out. And they simply assumed it was the case. And we think that's a credibility determination that is not appropriate. What's the record, what does the record show, if anything, regarding Mr. Soller's knowledge of the content of the grievance? I'm not going to be able to cite it to you right now, but I've read in Mr. Gonzales' deposition that eventually Mr. Soller's asked him to see the grievance and that Mr. Gonzales said he had to check with his superiors because nobody had ever asked to see a grievance before. So I think the record's going to be clear that it was not available to, you would think in the normal course, I'd fill out your grievance that I'm going to submit on your path and I'd give it to you. But this record doesn't have any of that information. That did not happen. All right, Your Honors, that's all I have. Do you want to save your time? Yeah, I'll save my 2.46. No problem. Okay. Thanks, Mr. Van Pembroek. Thank you. Can I say a word about Judge Fong? He's going to be missed. No question about that. Thank you. Okay. Ms. Bichner, over to you. Go right ahead. Good morning, Your Honors. May it please the Court, my name is Kathleen Bichner here on behalf today of the International Union of Elevator Constructors, Local 2. I'd first like to thank the Court for graciously agreeing to allow me to appear here virtually today, in addition to counsel for the appellant for agreeing not to impose that request. Before I get started on a very brief summary of the case and the union's positions, understanding that the Court has already read the briefs in this case, I just wanted to defer to Your Honors and see if there are any preliminary questions I could answer for you before we get started. Nope. Go right ahead. Okay. So to respond to some arguments raised by the appellant here today, the appellant opened his argument by indicating that the union did nothing to pursue a grievance on behalf of the appellant, which is simply factually inaccurate. The union pursued a grievance based on the layoff as the day that Mr. Sellers came in and reported that layoff and indicated he'd like to file a grievance regarding the same. The union obtained the full remedy available for that grievance pursuant to the contract, which would be back pay and reinstatement to his employment with TKE. Mr. Sellers was reinstated to employment by January of 2019, and the issue that was still being worked out through the grievance process was the back pay. The record shows that TKE was insisting, in order to settle the case for the full remedy short of arbitration, that Mr. Sellers drop his claim with the Illinois Department of Human Rights, which understandably Mr. Sellers was not willing to do, and the union respected that decision and continued to move the grievance through the grievance process all the while until obtaining the full remedy without the need for Mr. Sellers to drop his claim. Ms. Buechner, I apologize to interrupt you. I have a question about the grievance process. There was a time delay here, and I'm interested in what's in the record as to the cause of that delay, and if there's anything in the record about the typical timing on processing a grievance. Yes, Your Honor. It's fair to say that there was a delay here in the process. The union at each stage of the grievance, pursuing to the deadlines, did move the grievance to the next step, and no deadlines were missed in things, processes they should have. I'll admit there's not a ton of detail in the record that would indicate to the readers of the record, you know, several years on now, identifying exactly what was expended during that time, but I would note that no deadlines were missed. It continued to move through the process, and the next step in the process by which it was settled beforehand was a meeting of the National Arbitration Committee, and in order to conduct that meeting, it requires three representatives from both the union, but also three representatives from the Employers' Bargaining Association, which would include not only TKE, but other, you know, sort of major multinational corporations that are involved in that bargaining association in the elevator industry, and this was also during the beginning of 2020, during the height of COVID, but I will note that there's nothing in the record to suggest that there was any arbitrary, discriminatory, or bad faith reasons for the delay, and the record supported by Mr. Sellers' own testimony is that the union, specifically Mr. Gonzalez, then union business agent and ultimately the union's business manager, communicated with Mr. Sellers and provided him answers to his questions and concerns every time that he reached out to him. And also in terms of arguments raised here today by the appellant, I'd like to note that in terms of if the grievance had been styled as a racial discrimination grievance versus a grievance for the layoff itself, the remedies would have been the same. There would have been back pay available for a racially discriminatory layoff and reinstatement. There would have been nothing, and the collective bargaining agreement doesn't provide for any further remedies than that in this instance. And so what the union did through Mr. Ballone, the then business manager, when the grievance was first brought to its attention was to actually recommend to Mr. Sellers to file a claim with the State Human Rights Department to seek any other remedies that may be available to him, which he in fact did and maintained, and the union respected that he wanted to maintain that claim throughout the processing of his grievance. It did not disturb that. Ms. Bishop, what I hear Mr. Van Pembroek saying in substance, these are my words, not his, but what he's trying to convey I think is that when Mr. Sellers had a discussion with Mr. Ballone about the point that you just referenced, the concern about race discrimination and possibly going to the Department of Human Rights, that that is adequate notice to Mr. Ballone as union president or as a union representative to include that in a grievance in a world where the union prepares the grievance, not the employee. What's your response to that? Yeah, so a few things there. That is contradicted by the record. Sellers in his deposition testified that he did not bring any instances of racial discrimination to the union's attention. It was only in his later drafted affidavit after giving sworn testimony in a deposition, and I think that that same part of the record was cited here today during the appellate's presentation. In terms of enough notification to include that in the grievance, again, there would have been no difference in the type of grievance that would have been filed because there would have been no different remedies available to him through the contractual grievance process. And so what Ballone did was provide Mr. Sellers with the best possible information available to him to seek redress for what it was that he was looking for or for what he may have been entitled to. In addition, in terms of the racial discrimination grievance, had it been styled that way, it actually arguably would have put the burden on the union to carry the burden and prove that case, versus the way that it was styled. It put the burden on the employer to show, had it ultimately gone to arbitration before a third-party neutral, that it had just cause to lay off Mr. Sellers. And so in terms of the factual disputes here, the court did not ignore any material facts, nor did the court make credibility determinations. It simply relied upon the record. In addition to the appellate's argument that the grievance form, that there's not sufficient facts for the court to have found that it was Mr. Sellers that filled out the grievance form, there's uncontradicted testimony in the record from Mr. Gonzalez's testimony that Sellers came to the union hall on the day that he sought to file the grievance and filled out the paperwork. And there's no testimony, again, Sellers testified in the... Yes, it's unclear, but that the record at this point says that it was, you know, that Gonzalez testified that Mr. Sellers filled out paperwork regarding the grievance. There was no, unfortunately, follow-up question to identify specifically what that paperwork was. But there's no contradiction from Mr. Sellers other than this later filed affidavit after the parties had given depositions and sworn testimony to indicate that he did not fill out the grievance form. And so there was sufficient evidence in the record to assume that it was Mr. Sellers who filled it out. But in any event, that fact is immaterial because Mr. Sellers has testified that he didn't bring these indications that he requested to file racial discrimination grievance until this later filed affidavit. And the remedy would have been the same. So Mr. Sellers cannot prove any actual harm if even we accept everything as true that he, you know, requested that they file this racial discrimination grievance and that the union failed to do so. But again, there's no record evidence to support that. And it's immaterial given that there would be no actual harm. And there's law within the Seventh Circuit that says the union's under no affirmative duty to investigate and police incidents of racial discrimination. Again, with an outside entity here being, you know, this larger multinational corporation who employed Mr. Sellers. I believe the appellant also addressed during his presentation that there was a factual dispute regarding who was carrying the message in terms of that the grievance wouldn't be resolved unless and until Mr. Sellers dropped his state human rights discrimination claim. There is no factual dispute. Indeed, Mr. Sellers testified during his deposition that the offers that included back pay and reinstatement but with the requirement that he drop his claim with the Illinois Department of Human Rights were coming from TKE and he acknowledged that. And I believe that would conclude my presentation for today unless the court has any further questions that I'm happy to answer. I have a question. You know, I hear the union's argument that the remedies would have been the same. But isn't there a value in being heard and having an investigation? It puts the union in a difficult position with respect to other members. But isn't there value in that? Even though the end result might be the same in terms of back pay. Absolutely, Your Honor. And that is why it was the union through Valone who encouraged Mr. Sellers to file a claim with the Illinois Department of Human Rights. And that's exactly why the union throughout the grievance process respected his right to maintain that claim despite the employer wanting to resolve the matter by having him drop that. And the union respected his wishes and does think it's very important. And that's exactly why those things occurred. Okay. Ms. Bichner, thank you very much. We'll go back to Mr. Van Pembroek. Thank you, Your Honor. Just briefly. With regard to the claim that there was no information provided by Mr. Sellers of discriminatory conduct related to his layoff, the evidence is very clear that he advised the union that when he was told there was no work for him, he was immediately replaced by a Caucasian mechanic. And that is very clear evidence of discrimination. So this notion that the union was not aware of it is wrong. The affidavit that I cited for Mr. Sellers also recites the fact that he told Mr. Gonzalez about a number of incidences, including some that are very hard to find. What do you say to Ms. Bichner's point about the deposition testimony? With regard to the affidavit or with regard to this? With regard to notice of the union that one of the concerns with the layoff was race discrimination. Right. And what I was meaning to suggest to the court is when the union was advised that they tell an African American that there's no work for him and then hire a Caucasian the next day to fill his job, that is evidence of discrimination, and that was conveyed to the union from the very beginning. Wasn't there a – wasn't there – was he laid off with one other person? He was laid off twice, and he was laid off on the second time with another – not a mechanic, but an apprentice. Caucasian? No. Okay. No, no. Ms. Bichner – I'm sorry, Ms. Bichner. Excuse me. Forgive me. She talked about how we can assume that whatever papers Mr. Sellers filled out would have been the grievance, and that is such an anathema to the summary judgment standard, right? We know that there is not a record that will establish that. We know that Mr. Sellers has testified that he has no idea about the grievance process. So to have the trial court assume that somehow Mr. Sellers filled out the grievance and that contradicts his claim about ever wanting the union to pursue discrimination, that doesn't work. That's not proper under summary judgment standard. You should not assume that, and if you're going to make an assumption on this record, the assumption would be that, in fact, the union filled out the grievance. Thank you, Your Honors. You're quite welcome. Mr. Van Pembroek, thanks to you. Ms. Bichner, thanks to you. We'll take this appeal under advisement.